## LEIMBACH CONSTRUCTION COMPANY *v.* MAYOR AND CITY COUNCIL OF BALTIMORE, ET AL.

[No. 271, September Term, 1969.]

*Decided April 13, 1970.*

*Motion for rehearing filed May 12, 1970; denied June 3, 1970.*

The cause was argued before HAMMOND, C. J., and McWILLIAMS, SINGLEY, SMITH and DIGGES, JJ.

*Charles C. W. Atwater,* with whom were *Mylander & Atwater* on the brief, for appellant.

*Simon Schonfield, Assistant City Solicitor,* with whom were *George L. Russell, Jr., City Solicitor,* and *Clayton A. Dietrich, Chief Assistant City Solicitor,* on the brief, for appellee Mayor and City Council of Baltimore.

*Marvin M. Polikoff* for appellee Bettie O. Summers.

McWILLIAMS, J., delivered the opinion of the Court.

The boundaries of the triangular enclave within which lies the land of the appellant (Litty)[1] are Wilkens Avenue on the south, Caton Avenue on the east and the Pennsylvania Railroad on the northwest. On the opposite side of Wilkens Avenue are the spacious grounds of St. Agnes Hospital. On the other side of the railroad is Loudon Park Cemetery. Maiden Choice Run flows through the enclave, from west to east, continuing to its confluence with Gwynn's Falls, a half mile or so farther east. An occasional reference to the accompanying plat will facilitate comprehension of the facts. (See plat p. 641 *infra.*)

Litty, a general contractor, has outgrown his present place of business. Sometime prior to March 1969 he acquired an option to purchase the three acres of commercially zoned property designated Lot 10 and Lot 21 on the plat. Although legal access thereto is provided by Primson Avenue, vehicular access is, in fact, impossible because the bridge over Maiden Choice Run fell down fifteen, "maybe even forty" years ago. It seems that city officials displayed a massive indifference to Litty's suggestion that the bridge be rebuilt inspired, no doubt, by an estimated cost of $50,000 to $55,000. There were vague mutterings about splitting the cost but Litty had a notion that a crossing could be accomplished at a point about 100 feet southwest of Primson Avenue for about $12,000. He thereupon obtained an option to buy the irregularly shaped one acre of residentially zoned land designated P on the plat. He had in mind building a 30 foot drive-

---

1. Ernest J. Litty, the president and apparently the principal owner of the appellant, Leimbach Construction Company.

way from Primson Avenue across the easternmost panhandle thereof and thence over a bridge to Lots 10 and 21.

On 19 March 1969 Litty applied for a permit to "install [a] driveway and culvert across [the] corner of [the residential] lot." The application was disapproved by the zoning commissioner "for the reason that it violates [Section 11 of] the zoning ordinance." The Board of Municipal and Zoning Appeals took up Litty's appeal on 15 April. Bettie Owings Summers, the chairman of the St. Agnes Neighborhood Association, testified that of the 127 householders in the community at least 113 opposed Litty's application. She spoke, with obvious relish, of the defeat of an earlier (1960) attempt to rezone Lot P from residential to commercial. She expressed fears that Litty's tractor-trailer trucks, two to ten daily, would create a traffic hazard and be an "additional nuisance." Litty testified that he proposed to spend $300,000 to $400,-000 improving Lots 10 and 21. Some mention was made of pedestrian access to the cemetery through a tunnel under the railroad which it seems is on a 30 foot fill. Lots 10 and 21 were described as a "mess," a "jungle" and a "wilderness."

The Board found that the "testimony shows that the only access to Lot[s] 21 and 10 * * * is on Primson Avenue." It noted that "the operation of the [proposed] business would necessitate anywhere from two to ten trucks daily entering the area and that these trucks would be of the tractor-trailer type." It noted also that the opposition of the St. Agnes Neighborhood Association was based on a claim that the proposed use "would be an encroachment to the residential character of the neighborhood." The Board's resolution, dated 18 April, goes on to say:

> "The premises is vacant land on which it is proposed to construct a 30 foot driveway and metal culvert for ingress and egress to the adjoining commercial lot.

"Under the provisions of Sections 10 and 11 of the Zoning Ordinance, a business and a yard for the storage of motor vehicles are uses excluded from the Residential Use District. The proposal in this case is to construct a driveway and culvert and use that portion of the lot for ingress and egress to the commercially zoned property."

\* \* \*

"The Board is of the opinion that no sufficient reason was shown to make an exception to the use regulations as proposed in this appeal. The Board also finds that the proposal would be detrimental to the health, safety and welfare of the community.

"In accordance with the above facts and findings, the Board disapproves the application."

Litty's appeal from the decision of the Board came on for a hearing, before Sodaro, J., in the Baltimore City Court, on 11 June. Miss Summers testified there was a time when there were a few houses on Lot 21 access to which was by "a foot bridge across Maiden Choice Run \* \* \* [which was] never wide enough for any vehicle to go across." Litty's testimony before Judge Sodaro was brief. He said, as he did at the hearing before the Board, that there was no access to the property. His revelation that he had exercised the options to purchase Lots 10, 21 and P in May, *after* the decision of the Board, was something of a surprise to the court and counsel and it is not, to be sure, without significance. The consideration for Lots 10 and 21 was said to be $26,000; for Lot P, $12,000.

In affirming the action of the Board, Judge Sodaro said:

"The court is of the opinion that the proposed driveway would be a commercial use of residentially-zoned land in violation of the Zoning Ordinance. The Appellant contends that Sections 10 and 11 of the Zoning Ordinance do not

expressly prohibit the use of the driveway as an access route to the commercial lot; that the Ordinance should be strictly construed and should not be applied to interfere with the beneficial use of the property in question unless the restriction appears on the face of the Ordinance or by clear implication. This contention is without merit. The language of the pertinent sections of the Ordinance provides that only the uses prescribed in the Ordinance may be made of land in each zone classification. There is really nothing left for interpretation. * * *."

## I.

Section 11 of the zoning ordinance, Baltimore City Code, Art. 30 (1966), is as follows:

"In a Residential Use District, no use of land or building shall be excluded, except that
(a) no land or building shall be used; [for]
* * *
(1) Uses excluded from Residential and Office Use Districts [Section 10]
(2) Business offices
(3) Professional offices, except as provided in Section 12."

Section 10 prohibits the use of land in a residential district for "business" and for "storage yards for building or structural materials or equipment."

As Litty concedes, we seem never to have considered the precise question here presented; nor, we are told, have the courts of our sister states. Both Litty and the appellee (the City) have cited a number of cases but they all seem to deal either with different kinds of ordinances or else the properties in question were without access requiring consideration of the question whether the enforcement of the ordinance would be confiscatory. Of course, Litty insists the denial of his application is tantamount to confiscation but we do not see it quite that

way. It is clear, we think, that Litty's legal access to Lots 10 and 21 is by way of Primson Avenue. That he can't drive a motor vehicle onto the property is quite beside the point. Access can be accomplished on foot or on horseback; materials can be fetched by pack-train. A bridge would be far more convenient, of course, and, in the long run, much less expensive. But this is none of our concern and, what is somewhat more to the point, Litty knew the circumstances when he exercised his options and committed his company to the purchase of Lots 10 and 21.

The question then is not whether the action of the Board amounts to confiscation but simply whether the proposed use of Lot P is prohibited by the ordinance. We agree with Judge Sodaro that the use Litty proposes to make of the driveway shown in the plat would be a "business" use of land in a residential use district.

## II.

There is about this case a faint bouquet suggesting that Litty may be the victim of a little hanky-panky. We can understand the desire of the residents to preserve the insularity of their little quarter. To be able to thwart any use of Lots 10, 21 and P inures to their benefit, providing them, in effect, with a park or a playground at no expense to them or to the City. And in this, thus far at least, they have been successful. The City, on the other hand, having created value in the land by classifying it for commercial use, derives tax revenues from it without having to provide much, if anything, in the way of service. But Litty is entitled to enjoy any of the uses for which the land has been zoned and if his proposed use is neither prohibited nor unreasonable he ought not to be frustrated by a dog in the manger attitude on the part of the City and the neighborhood in respect of the bridge and the passage of a few trucks each day over Primson Avenue. As we see it there is no reason why Litty and the City should not be able to arrive at a mutually satisfactory arrangement in respect of the bridge provided negotiations looking to such an arrangement are under-

taken in the utmost good faith. All concerned should understand that any litigation which may develop in the future will be subject to careful scrutiny by the courts to see if there is any lack of good faith.

*Affirmed.*
*Costs to be paid by appellant.*